## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

MICAH KUNKLE,                          )
                                       )
Plaintiff,                             )
                                       )
vs.                                    )    NO. 3:08-CV-100
                                       )
PATROLMAN KIM COX, *et al.*,           )
                                       )
Defendants.                            )

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment, filed by Defendants, Marshall County Sheriff's Department, Marshall County Jail, Kim Cox, Nick Laffoon, and Rickey Dixon, in their individual and official capacities, on April 30, 2010. For the reasons set forth below, Defendants' motion is **GRANTED** as follows: the Clerk is **ORDERED** to **DISMISS WITH PREJUDICE** all claims against Defendants, Kim Cox and Nick Laffoon; the Clerk is **ORDERED** to **DISMISS WITH PREJUDICE** Plaintiff's claims under 42 U.S.C. § 1983 and the Eighth Amendment of the United States Constitution; and the Clerk is **ORDERED** to **DISMISS WITHOUT PREJUDICE** Plaintiff's state law claims under Article I § 16 of the Indiana Constitution. Furthermore, the Clerk is **ORDERED** to **CLOSE** this case.

## BACKGROUND

### Procedural Background

Plaintiff, Micah Kunkle, filed a complaint in this case on February 4, 2008, in the Marshall Superior Court, and the case was removed to this Court on February 29, 2008. The complaint revolves around a physical altercation between Kunkle and another inmate (Chad Shock) in the Marshall County Jail. In a nutshell, Kunkle alleges that Defendants, Marshall County Sheriff's Department, Marshall County Jail, and Rickey Dixon (hereinafter "Defendants"), failed to properly separate and segregate the inmates and caused Plaintiff's injuries when he was severely beaten.

Following extensive discovery, Defendants filed the instant motion for summary judgment on April 30, 2010. Defendants argue that Dixon is entitled to summary judgment because there is no evidence that he was deliberately indifferent to a risk of an imminent attack, and he is entitled to qualified immunity. Defendants also contend that the Marshall County Sheriff's Department is an agency of the Sheriff, thus not subject to suit. Finally, Defendants argue that the Marshall County Jail is entitled to summary judgment on the § 1983 claim because it did not adhere to an unconstitutional policy or custom and was not deliberately indifferent to officers' training; additionally, there is no evidence that a final policymaker for the Sheriff was personally involved in the alleged Constitutional deprivation. Kunkle filed

a response in opposition to the instant motion on May 21, 2010, controverting Defendants' arguments. Defendants filed a reply on June 7, 2010. As such, this motion is fully briefed and ripe for adjudication.

The Court notes that although Patrolman Kim Cox and Patrolman Nick Laffoon were originally named as defendants in the complaint, Kunkle has agreed to dismiss the claims against them because "after extensive discovery there are not sufficient facts to establish that Kim Cox and Nicholas Laffoon played a role in causing Plaintiff's injuries." (Opp. Mem., p. 11.) As such, summary judgment is granted against defendants Kim Cox and Nick Laffoon.


## Undisputed Factual Background

On January 20, 2006, Plaintiff Micah Kunkle was arrested for an altercation involving his ex-girlfriend. He was charged with sexual misconduct with a minor, intimidation with a deadly weapon, driving while suspended, battery resulting in bodily injury to another, and carrying a handgun without a license. (Micah Kunkle Booking Report ("Booking Report"), p. 1; Micah Kunkle Deposition ("Kunkle Dep."), pp. 14-16, 21-22.) Patrolman Kim Cox was at the scene of the altercation and transported Kunkle to the Marshall County Jail. (Kunkle Dep., p. 18.) At the time of his arrest, Kunkle was 23 years old, five feet six inches tall (5'6"), and weighed 160 pounds. (Booking Report, p. 1.)

Plaintiff was booked into the Marshall County Jail on January 20, 2006, and the following morning, he was assigned to cell block M-1. (Micah Kunkle Inmate Log ("Inmate Log"), p. 9.) M-1 was considered a maximum security cell - it had individual cells and a common day area. (Maryanne Martin Deposition ("Martin Dep."), p. 26.) However, due to overcrowding, M-1 was not used as a maximum security cell. (Martin Dep., p. 26.) At that time, the other inmates assigned to M-1 were Chad Shock, Frank Pancek, and Terry Heider.

When Kunkle entered the cell, Shock said, "[w]hy the f___ we got another one in here? There's no more room." (Kunkle Dep., p. 26.) Shock also told Kunkle that, "I'm gonna beat your ass when you're sleeping . . . [jail officer] Rickey Dixon's my cousin." (Kunkle Dep., p. 28.) Kunkle contends he told head jailer Michael Mattern, a friend of Kunkle's brother, that Shock was "freaking [him] out" and that he wanted to be transferred. (Kunkle Dep., p. 32.) Kunkle testified that he told jail officer Dixon that if he and Shock got into a confrontation, there would be a fight. (Kunkle Dep., pp. 60-61.) Kunkle also told an unnamed jail officer that he needed to move because he and Shock were not getting along. (Kunkle Dep., p. 29.) The jail records indicate that Kunkle was in M-1 from January 21- January 24, 2006, although Kunkle claims it was for a week and a half. (Affidavit of Michael Mattern, ("Mattern Aff.," ¶ 7; Kunkle Dep., p. 25.) Kunkle's Inmate log

4

indicates that he was moved from M-1 to D-4 on January 24, 2006, "because the inmates in M-1 advised they were sick of him crying all the time." (Inmate Log, p. 9.)

As Jailor Dixon came to the cellblock to move Kunkle, Shock pinned Kunkle against a wall and slammed a Bible into Kunkle's throat, telling him to "read this f___ing thing. This is the only thing that's gonna save your ass when you go to prison." (Kunkle Dep., p. 29.) According to Kunkle, Jailor Dixon witnessed the entire event. (*Id.*, pp. 29-30.) At that point, Kunkle and Dixon walked out of M-1. (*Id.* at 30.) This incident was admittedly the only time Shock laid a hand on Kunkle prior to his transfer, everything else was just verbal intimidation. (Kunkle Dep., pp. 30, 34.)

Kunkle was transferred to cellblock D-4, a dormitory style cellblock designed to house six inmates. The cellblock was open, with three bunk beds. Due to overcrowding, there were usually more than six inmates in D-4. Some of the inmates had to sleep on the floor. Usually inmates worked it out among themselves which ones would get a bed based on who had been in the cellblock longer. Jail officers noticed that Kunkle had a bed after only a couple of days in D-4. (Affidavit of Rickey Dixon, "Dixon Aff.," ¶¶ 9,10.) Also, other inmates were bringing him food. *(Id.)* Jailer Dixon suspected Kunkle was "running the block," or asserting control over the other inmates, and for management purposes, the jail did not

encourage such behavior. (*Id.*) Dixon was also aware that Kunkle made a threat to "punk" or "punk out" Officer Cox. *(Id.* at ¶ 10.) Dixon was concerned that Kunkle's attitude towards the officer could influence other inmates, and other jail officers told Dixon that they had noticed a change in Kunkle's attitude. *(Id.)*

Because of his concerns about Kunkle, Dixon called head jail officer Michael Mattern the evening of February 5, 2006, to discuss the possibility of transferring Kunkle. (Dixon Aff., ¶ 11.) Mattern agreed that Kunkle should be moved out of D-4 due to his attitude, and Mattern had concerns about Kunkle communicating with the female block. *Id.* Mattern had caught Kunkle standing on the toilets to talk to block F-1 through the ceiling vent at least twice. (Mattern Aff., ¶ 11.) Mattern and Dixon decided to transfer Kunkle back to M-1. (Dixon Aff., ¶ 11.) They believed because M-1 was a smaller cellblock, Kunkle would have fewer inmates to impress. (*Id.)*

Kunkle was moved back to M-1 on February 5, 2006, the night of the Super Bowl. Before moving Kunkle, Dixon went to M-1 and told inmate David Weirick that he was having trouble with someone else, and asked Weirick if he minded moving cell blocks. (Deposition of David Weirick, "Weirick Dep.," p. 14.) Weirick said he did not mind moving blocks, and Dixon took him to D-4. (*Id.*, pp. 14-15.) Neither Weirick nor Terry Heider, another inmate in M-1, heard Dixon tell Shock that Kunkle was returning to M-1 or that Shock

should attack Kunkle when he returned. (Weirick Dep., p. 16; Deposition of Terry Heider, "Heider Dep.," p. 29.) Shock denies that Dixon or anyone else set up a fight between him and Kunkle. (Deposition of Chad Shock, "Shock Dep.," pp. 16-17.)

According to Kunkle, when Dixon told him he was transferring back to M-1, Kunkle told Dixon he could not go back there because he had gotten into a confrontation with Shock. (Kunkle Dep., p. 45.) Kunkle contends that Dixon told him Shock had been taken "downstate" to prison a few days earlier, so Kunkle willingly went with Dixon to M-1. (Kunkle Dep., p. 45.) Dixon denies that the subject of Shock was ever discussed during the transfer. (Dixon Aff., ¶ 14.)

Once Dixon got to M-1, he opened the door for Kunkle, then Dixon left. (*Id.*) According to Shock and Heider (another inmate), Kunkle called Shock a "bitch." (Shock Dep., p. 16; Heider Dep., pp. 30, 46.) Shock himself testified that when he walked into the cell, he said something like, "[i]s that f__ing retard Chad gone?" (Kunkle Dep., pp. 69-70.) Kunkle may have said "jackass" or "idiot," but he believes he said "f__ing retard." (*Id.*, p. 70.) Martin saw Shock shove Kunkle, then they got into a fight. (Martin Dep., pp. 75-76.) Dixon was called back to the cellblock, and he saw Kunkle get punched in the face multiple times. (Dixon Dep., p. 80.) From the catwalk outside, Dixon heard Kunkle say "f___ you to Shock." (Dixon Aff., ¶ 15.) However, Dixon admitted that Shock was

the aggressor in the fight, and after the fight ensued, that Kunkle was trying to defend himself. (Dixon Dep., p. 79.) Kunkle was wearing glasses, and during the fight, they fell on the floor and were damaged. (Kunkle Dep., pp. 74-77.)

Dixon entered the cell to break up the fight. (Dixon Aff., ¶ 15.) After the fight, Dixon put Kunkle in a holding cell. While there, Kunkle told Dixon he wanted to go back into M-1 to fight Shock. (Kunkle Dep., p. 81; Dixon Aff., ¶ 16.) Dixon saw a small scratch on the bridge of Kunkle's nose which appeared to be from his glasses, and some red marks on the left side of his forehead. (Dixon Dep., p. 80.) Right after the fight, Kunkle accused Dixon of setting up the fight. (Kunkle Dep., pp. 81-82.) According to Kunkle, Dixon replied, "I didn't think you were gonna get hurt that bad." (Kunkle Dep., p. 83.) Dixon denies setting up the fight. (Dixon Aff., ¶¶ 16, 24.)

Once Kunkle was returned to D-4, he was walking around the cellblock and talking to inmates. Kunkle told the inmates he was going to sue "the f___ out of this place and everybody that works there" and that the county was "going down." (Kunkle Dep., pp. 93, 100.) Martin, Dixon, and Laffoon heard Kunkle over the microphones talking about suing the county, and the inmates encouraged him to sue. (Affidavit of Nicholas Laffoon, "Laffoon Aff.," ¶ 5; Dixon Aff., ¶ 17.) Dixon and Laffoon moved Kunkle to holding cell H-4. Kunkle started banging himself into the door and walls of the cell,

so he was moved to the padded cell, and when he continued to throw himself into the door and window frame, officers handcuffed and shackled Kunkle to prevent further injury. (Dixon Aff., ¶ 21; Laffoon Aff., ¶ 8.)

The day after the fight, Mattern talked to inmates Shock, Heider, Orbia Akers, and Frank Pancek. They told him when Kunkle came into M-1, he asked about Shock and referred to Shock as a "bitch." (Mattern Aff., ¶¶ 16, 17.) Jail commander Mark Secor investigated the fight, talked to people, reviewed surveillance video, inmate statements, and officer reports, and concluded that the fight occurred because Kunkle made a derogatory remark about Shock which provoked Shock to attack him. (Affidavit of Robert Ruff, "Ruff. Aff.," ¶ 12.)

Kunkle was eventually taken to the Marshall County Hospital where it was determined that he had a blow out fracture of the medial wall to his right eye. (Dr. John Langford Deposition, "Langford Dep.," p. 9.) Dr. Langford recommended surgery to repair the fracture by inserting an implant. (*Id.*, p. 8.) He also testified that the type of injury Kunkle suffered is normally caused by being punched, hit with a ball, or hit with anything else that could put pressure quickly on the eyeball. (*Id.*, p. 10.) The surgery occurred on February 17, 2006. (Langford Dep., p. 8.) Kunkle made a full recovery and is not expected to have further complications from his injury. (*Id.*, p. 43.)

Chad Shock had been incarcerated at the Marshall County jail on multiple occasions. On March 15, 2005, while incarcerated on another charge, Shock got into a physical altercation with inmate Goble – he pushed Goble. (Pl. Ex. D, Shock Inmate Log, p. 5.) The fight was witnessed and stopped by Jailor Dixon, and Dixon noted in the written log that Shock was the aggressor. (*Id.*) On July 6, 2005, Shock and another inmate began yelling at each other, and Shock had to be physically placed into his cell by Dixon. (*Id.*, p. 7.) On August 8, 2005, Jailor Maryanne Martin heard Shock yelling and waving his arms around at another inmate, then saw Shock grab the inmate by his neck and throw him to the floor. (*Id.*, p. 8.) On September 24, 2005, Shock covered the video camera and began yelling. (*Id.*)

Shock was released on October 26, 2005, but arrested again on November 19, 2005. (*Id.*, p. 9.) Shock was charged with battery by means of a deadly weapon and intimidation using a deadly weapon. (Pl. Ex. C, Shock Booking Report, p. 1.) Shock's security status was raised from minimum to medium because he was charged with battery on a county employee – Jailor Maryanne Martin. (*Id.*, p. 1; Martin Dep., p. 15.) Martin knew Shock since approximately 1999 or 2000. (Martin Dep., pp. 12-13.) Although she denies having a romantic relationship with Shock, Martin admits that Shock moved into her house after he was released from prison on October 26, 2005. (*Id.*, p. 13.) While living at Martin's house, Shock

attacked Martin, threatened to kill her, put a knife to her neck, and drew blood. (*Id.*, p. 15.)

Defendant Jailor Dixon and Shock are related - Dixon's father was married to Shock's aunt, thus they are cousins. (Dixon Dep., pp. 19-20.) Dixon met Shock a few times as kids, and then again when Dixon worked at the jail. (*Id.*, p. 21.) Dixon was aware of Shock's attack on Maryanne Martin, and of Shock's history. (*Id.*, p. 39.) Some jail employees felt that Shock should be transferred to another facility because he attacked Martin. (Dixon Dep., p. 16.) Shock told Dixon that he wanted to go to Logansport State Hospital. (*Id.*, pp. 46-47.)

Dixon received training as required by law prior to performing jail officer duties. Jail officers also received on-the-job training and attended the jail officer's training course at the Indiana Law Enforcement Academy, as well as received continuing education as required by the Indiana Jail Standards. (Laffoon Aff., ¶ 1; Dixon Aff., ¶ 1.) In 2006, the Marshall County jail operated under a Methods and Procedures Manual. (Ruff Aff., ¶ 5.) The section relating to inmate discipline states that jail officers have a duty to protect inmates from acts of violence and acknowledges that failure to do so could constitute a violation of the Eighth Amendment if an officer knows of, and disregards, an excessive risk to the inmate's safety. (Ruff Aff., ¶ 6; Ex. A.) The manual also provides that jail officers must ensure that

inmates do not exercise authority over other inmates. (Ruff Aff., ¶ 6.)  The inmate rules section prohibits assaults against and manipulation of other inmates.  (Ruff Aff., ¶ 6; Exs. B and C.)

DISCUSSION

The standards that generally govern summary judgment motions are familiar.  Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).  In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *NUCOR Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes "demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  Once the movant has met

this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (emphasis in original) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be "'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

13

**Rickey Dixon is Entitled to Summary Judgment Because He Did Not Act**
**With Deliberate Indifference to Kunkle's Safety**

Kunkle's complaint states a cause of action against Dixon in an individual capacity under the Eighth Amendment. (Compl., Count 4.) The Eighth Amendment prohibits "cruel and unusual" conduct to convicted prisoners. *See Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979); *Shorter v. Lawson*, 403 F.Supp.2d 703, 706 (N.D. Ind. 2005). On February 5, 2006, the date of the incident, Kunkle was a pretrial detainee; therefore, the Eighth Amendment does not apply to Kunkle. *Id.* However, courts have found that the Due Process Clause of the Fourteenth Amendment extends protection to pretrial detainees at least as extensive as that provided by the Eighth Amendment to convicted prisoners. *Bell*, 441 U.S. at 535 n. 16; *Lewis v. Downey*, 581 F.3d 467, 473 (7th Cir. 2009); *Guzman v. Sheahan*, 495 F.3d 852, 856 (7th Cir. 2007); *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000) (noting that there is "little practical difference between the two standards.").

"Prison officials owe inmates, both those who have been convicted and those being detained while awaiting trial, a duty to protect them from violence inflicted by other inmates." *Guzman,* 495 F.3d at 856-57 (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). However, not every injury inflicted by another prisoner rises to the level of violation of civil rights. *Fisher v. Lovejoy*, 414 F.3d 659, 661-62 (7th Cir. 2005). The Supreme Court has recognized that inmates are entitled to relief only when their

injury is objectively serious and the prison official acted with deliberate indifference to the inmate's safety. *Id.* (citing *Farmer*, 511 U.S. at 834). Although there is some speculation in the memoranda that Kunkle may have suffered his injuries more from banging his head against the cell wall than at the hands of Shock, for the purpose of this summary judgment motion, the Court will take as true the fact that Kunkle suffered a fracture of the medial wall to his right eye from a fight with Shock, and that this constitutes a serious injury which Kunkle had a constitutional right to be free from.

In order to survive summary judgment against this claim against Jailer Dixon in his individual capacity, Kunkle must demonstrate a genuine issue of material fact with respect to Dixon's "deliberate indifference" to Kunkle's safety. *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008). This requires a showing that Kunkle was "incarcerated under conditions posing a substantial risk of serious harm" and a showing that the "individual prison officials had subjective knowledge of the risk of harm, which they personally disregarded." *Grieveson*, 538 F.3d at 775 (quoting *Farmer*, 511 U.S. at 834). Conduct by the prison official that is simply negligent or inadvertent is not sufficient. Instead, the prison official much have subjective knowledge of a substantial risk of serious harm, and must fail to take reasonable measures to prevent that harm from occurring. *See Grieveson*, 538

F.3d at 775; *Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999) (reiterating subjective component which requires jail officials knew of a substantial risk of serious injury but nevertheless failed to take reasonable measures to prevent that harm). Thus, in order to prevail, Kunkle must present evidence that Dixon knew of a substantial risk of serious harm to Kunkle, and failed to take reasonable measures to prevent that harm from occurring. *Pinkston v. Madry*, 440 F.3d 879, 889 (7th Cir. 2006). This is a "high hurdle" for Plaintiff to overcome - he must provide some evidence that Dixon was aware of facts from which an inference could be drawn that Dixon showed total unconcern for Kunkle's welfare. *See Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006); *Zentenmeyer v. Kendall County, Illinois*, 220 F.3d 805, 811 (7th Cir. 2000). "[B]efore the prison guards may be found to have violated the eighth amendment, the plaintiff must establish by a preponderance of the evidence that the guards had knowledge of the attack, that they failed to prevent or stop the attack, and that by failing to prevent or stop the attack they 'wanted harm to come to the prisoner.'" *Gibbs v. Franklin*, 18 F.3d 521, 525 (7th Cir. 1994); *see also Klebanowski v. Sheahan*, 540 F.3d 633, 639 (7th Cir. 2008) (finding plaintiff must produce evidence that defendant knew of the risk and made a conscious decision to disregard the risk).

Kunkle argues that Dixon was indeed deliberately indifferent to Kunkle's established constitutional right to be free from

serious harm because: (1) he was aware of specific confrontations between Kunkle and Shock when he put Kunkle back into M-1; and (2) he was aware of Shock's violent history. The Court will address these arguments in turn.

Kunkle argues that Dixon was aware of a specific threat of violence to Kunkle posed by Shock. First, he contends that Dixon was aware of Shock's "prior violent criminal history." (Opp. Mem., p. 12.) Taking Kunkle's testimony as true, he told head jailer Mattern that Shock was "freaking him out" and he wanted to be transferred. (Kunkle Dep., p. 32.) Additionally, Kunkle also told an unnamed jailer that he and Shock were not "getting along." (Kunkle Dep., p. 29.) However, there is no evidence in the record that Dixon was personally aware of these two statements made by Kunkle, or that they were ever communicated to him. To prevail, Kunkle has to offer proof that Dixon himself had "actual knowledge of an impending harm easily preventable." *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997).

It is true that Dixon was present when Kunkle was originally transferred to D-4 and Shock slammed a Bible against Kunkle's throat and told him to read it. (Kunkle Dep., pp. 29-34.) Dixon also heard Kunkle state that if he and Shock got into a confrontation, there would be a fight. (Kunkle Dep., pp. 60-61.) The Court views this statement and the Bible incident as too vague to indicate to Dixon that Kunkle faced a serious and real risk of

being attacked by Shock. *See, e.g., Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (finding statements that other inmates were "pressuring" plaintiff and "asking questions" were too vague and inadequate to put prison officials on notice that inmate faced substantial risk of attack); *Klebanowski*, 540 F.3d at 639 (finding inmate's statements that he "feared for his life" and wanted to be transferred were insufficient to show officers were aware of specific threat); *Greiveson*, 538 F.3d at 776 (holding inmate's statement that he was afraid and wanted to be moved did not show awareness of specific risks); *Butera v. Cottey*, 285 F.3d 601, 606 (7th Cir. 2002) (finding prisoner's statements that he was "having problems in the block" and "need[ed] to be removed" insufficient to establish deliberate indifference). Like the facts in these Seventh Circuit cases, the Bible incident and the statement is insufficient to show that Dixon was aware of a serious and specific threat that Shock posed to Kunkle. Dixon testified during his deposition and in his affidavit that he was unaware of any problems during Kunkle's initial stay in M-1. (Dixon Aff., ¶ 11; Dixon Dep., pp. 64-65.) Moreover, Kunkle has not offered any evidence that the attack was planned by Shock, or that Dixon set-up the attack. Kunkle has not provided any evidence that Shock was almost certain to attack him if Kunkle was returned to M-1. Rather, the evidence shows that Kunkle's own statement(s) triggered the fight.

Finally, although Dixon denies it, Kunkle testified that when

he was being moved back to M-1, he told Dixon he could not go back there because he and Shock got into a confrontation the last time, and Dixon told him Shock had been transferred. (Kunkle Dep., p. 45.) Even if Kunkle did tell Dixon he did not want to return to M-1, "prison guards are not required to believe every profession of fear by an inmate." *Lindell v. Houser*, 442 F.3d 1033, 1035 (7th Cir. 2006). "[P]risoners may object to potential cellmates in an effort to manipulate assignments, or out of ignorance; thus although a protest may demonstrate risk it does not necessarily do so." *Riccardo v. Rausch*, 375 F.3d 521, 527 (7th Cir. 2004). Certainly, Kunkle may have wanted to stay in M-4 since he seemed to be "running the block" there. Additionally, given the absence of evidence describing any specific threats from Shock, there was no compelling reason for Dixon to believe that Kunkle was at serious risk.

Kunkle also argues that Shock's previous violent criminal history in jail placed Dixon on notice of a specific threat of violence to Kunkle. The Court disagrees that Shock's overall jail history indicates that Shock was generally extremely dangerous. On March 15, 2005, Shock grabbed an inmate, Dixon ordered the inmates to stop fighting, and he moved Shock to a hall cell for three hours. Four months later, on July 6, 2005, Shock and another inmate (Holzwart), started arguing, and Dixon pushed Shock into D-3. Finally, a log entry for August 8, 2005, records that Shock

pushed another inmate onto the floor; however, Dixon was not involved in this incident, and there is no evidence in the record that Dixon was personally aware of this incident. *See Longoria v. Texas*, 473 F.3d 586, 594 (5th Cir. 2006) (finding summary judgment based on qualified immunity warranted where there was no evidence defendant officer knew of plaintiff's communications with other officers about his fear of being attacked). Thus, considering the three minor incidents that Shock was involved in at the Marshall County Jail, the Court does not believe they are sufficient to establish that Dixon knew that Shock would attack Kunkle. Moreover, before the incident with Kunkle in February 2006, Shock had been in jail since November 18, 2005, without any other problems with other inmates. *See, e.g., Norma v. Scheutzle*, 585 F.3d 1097, 1105 (8th Cir. 2009) (finding warden not deliberately indifferent to risk posed by inmate with five prior administrative segregations for assaults on other inmates, and who cut the letter "C" into hair of another inmate, given the seven months of appropriate behavior prior to the attack on plaintiff); *Lindell,* 442 F.3d at 1035 (holding prison officials not deliberately indifferent to risk of white supremacist inmate by housing him with African-American inmate member of Gangster Disciple given passage of 18 months between last confrontation with member of gang); *Curry v. Crist*, 226 F.3d 974, 978 (8th Cir. 2000) (concluding no deliberate indifference when inmate with violent history, who made

threats to commit mass murder in prison, was allowed into general prison population after extensive period of nonviolent conduct).

Although Plaintiff cites *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008), which states that where prison officials "know that there is a cobra in there, or at least that there is a high probability of a cobra there, and do nothing, that is deliberate indifference," like the actual ruling in *Dale*, the "focus is on the defendants' subjective state of mind."  In that case, the Seventh Circuit held that the plaintiff's "vague statements that inmates were 'pressuring' him and 'asking questions' were simply inadequate to alert the officers to the fact that there was a true threat at play."  *Id.*

Kunkle also argues that because Dixon was aware of Shock's prior violent attack on Jailor Maryanne Martin, Dixon should have known that Shock was going to attack Kunkle if given the opportunity.  The fact that Shock committed a violent act outside of the jail environment cannot possibly put Dixon on notice that Shock could not be housed in the general population of the jail.  Probably a large portion of the jail's inmates committed some type of violent act before being sent to prison.  "[P]risons 'are not required to segregate indefinitely all inmates whose original crimes suggest they might be capable of further violence.'" *Blades v. Schuetzle*, 302 F.3d 801, 803-04 (8th Cir. 2002) (quoting *Curry*, 226 F.3d at 978).  Moreover, Martin testified that within the jail

environment, Shock did not have violent propensities. (Martin Dep., pp. 16, 22-23.) Thus, the incident with Martin does not establish that Dixon personally knew of and disregarded a substantial risk that Shock would attack Kunkle.

Plaintiff attacks Dixon's reasons for moving Kunkle, claiming they are inconsistent. Plaintiff points to Dixon's deposition testimony that he moved Kunkle because he was "running the block," compared to Kunkle's Inmate Log, which did not record any disturbances in D-4. Additionally, Plaintiff points to Dixon's deposition in which he testified he did not recall whether he checked the "enemy list" before he moved Kunkle back to M-1, compared to Dixon's affidavit, which states he checked the log and saw that Kunkle had no enemies in M-1. The Court views these inconsistencies as minor, and not creating a fact issue as to whether Dixon was deliberately indifferent to Kunkle's safety. Even assuming, *arguendo*, that Dixon had checked the log before moving Kunkle back to M-1, Shock was not listed as an "enemy" at that time – it was only after the fight that Shock was listed as Kunkle's enemy. (Mattern Aff., ¶ 5.) Moreover, there are ample legitimate reasons in the record for Kunkle to have been transferred out of D-4. Dixon noticed that Kunkle had a bunk after being in the cellblock for a short time, and that other inmates were bringing him food, thus, he seemed to be asserting authority over the other inmates in D-4. Dixon had also been told that

Kunkle made a threat to "punk" Officer Kim Cox, and Kunkle acknowledges having told inmates in D-4 that he "punked" Cox. (Kunkle Dep., p. 166.) Moreover, Kunkle had been caught attempting to communicate with the female block - other inmates had been moved from D-4 for this same reason. (Mattern Aff., ¶ 11.)

It is undisputed that when Kunkle was returned to M-1, Kunkle first called Shock something like a "f___ing retard," or other derogatory term. This aggressive behavior seems to have set off the fight. "In order to infer callous indifference when an official fails to protect a prisoner from the risk of attack, there must be a strong likelihood rather than a 'mere possibility' that violence will occur." *Watts v. Laurent*, 774 F.2d 168, 172 (7th Cir. 1985) (quotation omitted). Under the circumstances of this case, Dixon was not callously indifferent in failing to protect Kunkle from an attack by Shock when he returned Kunkle to M-1. The record establishes that Dixon was not aware that Shock posed a substantial risk of serious harm to Kunkle. As such, because Dixon did not violate a clearly established constitutional right, he is also entitled to qualified immunity and summary judgment. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).


Summary Judgment is Also Warranted for Plaintiff's 1983 Claims

Kunkle also names as a defendant in this action the "Marshall County Jail." (Compl., p. 3.) However, Kunkle may not proceed

against the jail in this action. Section 1983 imposes liability on any "person" who violates an individual's federally protected rights "under color of state law." 42 U.S.C. § 1983. "A jail is a building, and 'is not a person – it is not a legal entity to begin with.'" *Vaughn v. Lake County Jail*, No. 3:09-cv-0072 WL, 2009 WL 973493, at *2 (N.D. Ind., April 9, 2009) (quoting *Powell v. Cook County Jail*, 814 F.Supp. 757, 758 (N.D. Ill. 1993) (dismissing action against Cook County Jail because, *inter alia*, it was not a proper named party)); *see also Rowan v. Pierce County Jail*, No. 09-cv-224-SLC, 2009 WL 3270179, at *2 (W.D. Wis. Oct. 9, 2009) (dismissing Defendant Pierce County Jail because it was not a proper party under section 1983); *Brown v. Cook County Jail*, No. 01 C 1843, 2001 WL 292700, at *1 (N.D. Ill. Mar. 26, 2001) (noting that Cook County Jail is not a proper party because it is not a legal entity). As such, summary judgment in favor of the Marshall County Jail is warranted.

The complaint names the Marshall County Sheriff's Department as a Defendant (Compl., p. 2), but this also is not proper. "[A] sheriff's department [i]s not a legal entity subject to suit under § 1983." *Slay v. Marion County Sheriff's Dep't*, 603 N.E.2d 877, 887 (Ind. Ct. App. 1992) (citing *Rhodes v. McDannel*, 945 F.2d 117, 120 (6th Cir. 1991)). In *Jones v. Bowman*, 694 F.Supp. 538, 544 (N.D. Ind. 1988), the Court stated:

> The Defendants assert that the Sheriff's Department may not be sued because it has no

> separate corporate existence. . . . A city's
> police department is merely a vehicle through
> which the city government fulfills its policy
> functions and is not a proper party defendant.
> The court can find no reason why the same
> conclusion would not apply to a county
> sheriff's department. Accordingly, the
> defendant Office of the Sheriff of Elkhart
> County is entitled to judgment as a matter of
> law.

*Jones*, 694 F.Supp. at 544 (citations omitted). Thus, summary judgment is proper as to the Marshall County Sheriff's Department for the claim against it under § 1983.

The proper party would be the Sheriff in his official capacity. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). However, any claim against the Sheriff fails under *Monell v. Dep't Of Soc. Services*, 436 U.S. 658 (1978). When a plaintiff brings suit against a municipality under § 1983, the plaintiff must allege the existence of an unconstitutional policy or custom of the municipality in order to survive summary judgment. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[local] governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."); *see also Monell*, 436 U.S. at 690-91. A municipality cannot incur liability in an action under § 1983 merely because it employs a tortfeasor. *Monell*, 436 U.S. at 691.

Municipal liability under § 1983 is limited. In *Monell*, the Supreme Court restricted liability to cases in which "the action that is alleged to be unconstitutional implements or executes a

policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." *Id.* at 690. A plaintiff seeking to find a municipality liable under § 1983 must also establish a causal nexus between his injury and the municipality's alleged policy or custom. *Id.* at 693-94. In other words, the entity's policy or practice must be the "direct cause" behind the constitutional violation. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 820 (1985); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

Policy or custom claims can take one of three forms: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policymaking authority. *Garrison v. Burke*, 165 F.3d 565, 571-72 (7th Cir. 1999); *Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008). Kunkle tries to place liability on the Sheriff by arguing that the Sheriff failed to properly house inmates according to security classification due to overcrowding. (Opp. Mem., pp. 16-17.) Both Martin and Dixon testified that although cellblocks M-1 and M-2 were designed to house maximum security inmates, due to overcrowding, inmates were not assigned according to their security designation. (Martin Dep., pp. 25-26; Dixon Dep., pp. 23-24, 27-

28.) As the Defendants point out, there is no constitutional requirement that inmates be classified by security level. *Burrell v. Hampshire County*, 307 F.3d 1, 10 (1st Cir. 2002) ("policy of not screening and then segregating potentially violent prisoners from non-violent prisoners is not itself a facial violation of the Eighth Amendment"); *Martin v. Tyson*, 845 F.2d 1451, 1456 (7th Cir. 1988) ("classification of inmates, whether or not desirable, is not a constitutional requirement"); *Yergeau v. Vermont Dep't Of Corrections,* No. 5:09-CV-141, 2010 WL 1472899, at *1 (D. Vt. Mar. 8, 2010); *Carmichael v. Richards*, 307 F.Supp.2d 1014, 1025-26 (S.D. Ind. 2004).

Thus, to establish an unconsitutional policy or custom, Kunkle would need to point to some evidence that the failure to house by security designation and/or overcrowding caused the fight between Kunkle and Shock. "At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." *Carmichael*, 307 F.Supp.2d at 1025 (quoting *Tuttle*, 471 U.S. at 823). Kunkle has presented no such evidence (such as statistical data suggesting fights are caused by housing medium security inmates like Shock with minimum security inmates like Kunkle). Although Kunkle cites to *Jackson v. Marion County Sheriff's Dep't*, No. 103CV0879DFHTAB, 2005 WL 3358876, at *8 (S.D. Ind. Dec. 9, 2005), in which the court denied summary judgment on an overcrowding claim, this case is readily distinguishable. In

*Jackson*, the plaintiff:

> [P]ut forth evidence showing that at least as of
> May 1999 (27 years after the lead lawsuit was
> filed), the Sheriff was on notice that the
> overcrowded conditions of the Lock-Up led directly
> to inmate-on-inmate violence in violation of
> constitutional protections. In May 1999, for
> example, Judge Dillin found that due to
> overcrowding in the Lock-Up, 'fights in the
> cellblocks are commonplace, supervision within the
> cellblocks is minimal, fortuitous, or nonexistent,
> and injuries from the conflicts are an everyday
> occurrence . . .'

*Jackson*, 2005 WL 3358876, at *8. Kunkle has produced no such evidence in this case that the alleged lack of segregation and/or overcrowding directly caused violence in the Marshall County Jail.

Kunkle also claims that a constitutional injury was caused by Defendant Dixon, who he argues was a final policymaker. (Opp. Mem., pp. 17-18.) Dixon is not a final policymaker. State law determines who is a final policymaker. *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 675-76 (7th Cir. 2009); *Eversole v. Steele*, 59 F.3d 710, 716 (7th Cir. 1995). In Indiana, the county sheriff is the person with final policymaking authority. *Eversole*, 59 F.3d at 716; *Estate of Rice ex rel. Rice v. Correctional Med. Servs.*, No. 3:06-CV-697 RM, 2009 WL 1748059, at *18 (N.D. Ind. June 17, 2009). The facts in this case support the conclusion that Dixon was not the final policymaker - he consulted head jail officer Michael Mattern during the early evening of February 5, 2006, about the possibility of transferring Kunkle, and Mattern agreed that Kunkle should be moved out of D-4 due to his

attitude.  (Mattern Aff., ¶¶ 9-12.)

While Dixon testified that he called Mattern to confer on Kunkle's move, he also said it was Dixon's decision, and he had the authority to move inmates.  (Dixon Dep., p. 62.)  Yet, "[t]he fact that a particular official - even a policymaking official - has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986) (citation omitted).  Rather, such official also must be responsible for establishing final government policy on a particular issue.  *Id.* at 482-83.  Helpful factors to be considered in determining whether an official is a final decisionmaker are:

> (1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.

*Valentino*, 575 F.3d at 676 (quoting *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995)).

As a jail officer, Dixon did not have final policymaking authority.  Between Dixon and the Sheriff, there was a chain-of-command of head jailer Mattern, and jail commander Mark Secor. (Dixon Dep., p. 17.)  Taking Dixon's comments as true, although he had the authority to transfer inmates, that is quite different than the authority to set the policies regarding inmate housing

assignments. Kunkle has presented this Court with no evidence that the Sheriff delegated such ability to set the policies to Dixon. This conclusion is consistent with similar cases from the Seventh Circuit which have held that police officers, even high ranking ones, are not final policymakers. *See Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001) (Chicago Police Department superior officers not policymakers); *Fiorenzo v. Nolan*, 965 F.2d 348, 352 (7th Cir. 1992) (finding police chief who worked under sheriff and had authority to make low-level transfers within the department was not a final policymaker); *Lyttle v. Killackey*, 528 F.Supp.2d 818, 828 (N.D. Ill. 2007) (finding police officers not policymakers). Thus, the fact that Dixon could assign inmates to cellblocks does not make him a final policymaker. Moreover, Kunkle has presented no evidence that Sheriff Ruff had any involvement in the decision to transfer Kunkle to M-1, or that he was aware that Shock posed a risk to other inmates like Kunkle.

In sum, Kunkle has not satisfied his burden of proving that Dixon was a final policymaker. *See, e.g., Eversole*, 59 F.3d at 715-16 (holding detective and Sheriff did not have final policymaking authority with respect to investigation and arrest of plaintiff). For these reasons, summary judgment is warranted for Kunkle's section 1983 claims against the Marshall County Jail, the Marshall County Sheriff's Department, and Defendant Dixon in his official capacity.

<u>Plaintiff's State Law Claims Are Dismissed Without Prejudice</u>

The complaint also states a claim for violation of Article 1, § 16 of the Indiana Constitution. (Compl., p. 2.) Upon due consideration, the state law claims are **DISMISSED WITHOUT PREJUDICE** because the federal claims have been dismissed prior to trial. 28 U.S.C. § 1367(c)(3); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."). Although Defendants argue that Kunkle waived any argument regarding his claim under the Indiana Constitution because he did not address the state claims in his opposition memorandum, it is this Court's practice to dismiss such claims without prejudice, and not to rule on them.

<u>CONCLUSION</u>

For the aforementioned reasons, Defendants' motion for summary judgment is **GRANTED** as follows: the Clerk is **ORDERED** to **DISMISS WITH PREJUDICE** all claims against Defendants, Kim Cox and Nick Laffoon; the Clerk is **ORDERED** to **DISMISS WITH PREJUDICE** Plaintiff's claims under 42 U.S.C. § 1983 and the Eighth Amendment of the United States Constitution; and the Clerk is **ORDERED** to **DISMISS WITHOUT PREJUDICE** Plaintiff's state law claims under Article I § 16 of the Indiana Constitution. Furthermore, the Clerk is **ORDERED** to

**CLOSE** this case.


DATED: December 22, 2010                    /s/ RUDY LOZANO, Judge
                                            United States District Court